UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------X
SPARKLE MCCULLOUGH,

                    Plaintiff,

-against-

JOHN T. MATHER HOSPITAL OF PORT
JEFFERSON, NEW YORK, INC.,
                  Defendant.
-------------------------------------------------------X

**MEMORANDUM & ORDER**

16-CV-4968 (DRH)(SIL)

**APPEARANCES:**

**For Plaintiff**
Shulman Kessler LLP
534 Broadhollow Road, Suite 275
Melville, New York 11747
By:    Troy L. Kessler, Esq.
        Garrett Kaske, Esq.

**For Defendant:**
Putney, Twombly, Hall & Hirson LLP
521 Fifth Avenue
New York, New York 10175
By:    Mary Ellen Donnelly, Esq.
        A. Sonu Ray, Esq.

**HURLEY, Senior District Judge:**

Plaintiff Sparkle McCullough ("Plaintiff" or "McCullough") commenced this action against defendant John T. Mather Hospital of Port Jefferson, New York, Inc. ("Defendant" or the "Hospital") asserting causes of action under Title VII of the Civil Rights Act of 1964, 42 U.S.C. 2000e, et seq. ("Title VII") and the New York State Human Right Law, N.Y. Exec. Law § 296 ("NYSHRL") for race discrimination in the form of a hostile work environment and for retaliation. Presently before the Court is Defendant's motion for summary judgment. For the reasons set forth below, the motion is granted.

# BACKGROUND

The following facts are taken from the parties' 56.1 Statements and are undisputed unless otherwise noted.

## I.      The Parties and Other Individuals Involved

The Hospital is a voluntary, not-for-profit, acute health care facility located in Port Jefferson, New York; it is an equal opportunity employer with strict policies against discrimination and retaliation. (Pl.'s 56.1 ¶¶ 1-2.)

Raymond Gulino ("Gulino") is the Administrative Director of Laboratory Services at the Hospital. His responsibilities include, among other things, oversight of the clinical laboratory in conjunction with the Medical Director, administrative functions, oversight of laboratory supervisors, and working with staff and supervisors in the hiring and testing processes. Christy Evangelista ("Evangelista") was the Phlebotomy Supervisor during the time of Plaintiff's employment with the Hospital. As such she was responsible for oversight of the staff and phlebotomists, scheduling and inventory. Wayne Shattes ("Shattes") is the Vice President of Administration at the Hospital and is responsible for oversight of a variety of professional and support departments, including but not limited to, the laboratory departments, at the Hospital. Christine Ricci ("Ricci") is a staff member of the Phlebotomy Department and was a coworker of Plaintiff. Diane Marotta ("Marotta") is the Vice President of Human Resources and is responsible for the administration of all human resources related issues, including employee related policies,  and the administration of personnel hiring and employment status changes. (Pl.'s 56.1 ¶¶ 6-14.)

## II.     Plaintiff's Employment at the Hospital

Plaintiff submitted an application for the position of a per diem laboratory assistant in the Hospital's Phlebotomy Department on September 30, 2014. After having been interviewed by Gulino and Evangelista, Plaintiff received an offer of employment on November 7, 2014 for the position. While Plaintiff admits that per diem employees are not guaranteed a specific number of hours in a week, she claims she was hired to work four or five days a week.  Plaintiff commenced employment with the Hospital on November 7, 2014 as a per diem Laboratory Assistant in the Phlebotomy Department, supervised by Evangelista and Gulino. (Pl.'s 56.1 ¶¶ 15-18.)

Pursuant to Hospital policy, which is uniformly enforced, newly hired employees are subject to a three-month probationary period, after which they receive a performance evaluation. Depending on the employee's performance and three-month evaluation, an employee's probationary period may be extended for an additional three months. As a new employee, Plaintiff was subject to a three-month probationary period and attended the Hospital's orientation program where she received copies of the Hospital's Standards of Performance Booklet, Code of Conduct and Compliance Manual.  (Pl.'s 56.1 ¶¶ 19-23.)

## III.     Plaintiff Complains about Ricci's Comments.

On December 18, 2014, Plaintiff complained to Evangelista about racist comments made to her by Ricci. There were three comments about which Plaintiff complained: (1) in November 2014, Ricci asked Plaintiff why her hair was so straight; (2) in December 2014, Ricci asked Plaintiff how she was able to get her hair so straight since Black women typically have kinky hair; and (3) in December 2014, when, in response to an inquiry by Ricci Plaintiff said she lived in Brooklyn before moving to Long Island, Ricci asked why "you people" are moving out to

Long Island to raise their children. Plaintiff advised Evangelista that at least one of the comments was made in the presence of another employee in the Phlebotomy Department, Dana Saparito. Evangelists brought the complaint to the attention of Gulino who initiated an investigation into Plaintiff's complaint that day. Gulino's investigation of Plaintiff's complaint against Ricci, included meeting with Plaintiff, Ricci, and Ms. Saparito individually. (Pl.'s 56.1 ¶¶ 24-30.)

During her December 18, 2014 meeting with Gulino, Plaintiff advised him that she did not want to get Ricci in trouble, but she did want the Hospital to educate Ricci regarding her inappropriate comments. Gulino assured Plaintiff that the Hospital would immediately investigate the matter and take any action deemed appropriate as a result of the investigation. Gulino also interviewed Ms. Saparito on December 18, 2014, who confirmed that she overheard the conversation between Ricci and Plaintiff during which Ricci made the comment about "you people" moving to Long Island. That same day, Gulino met with Ricci who admitted she made the comments reported by Plaintiff but claimed they were misinterpreted. According to Ricci, when she made the comments about moving to Long Island, she was simply raising a question about why so many people from Brooklyn and Queens were moving to Long Island. When Gulino asked Ricci about the comment regarding Plaintiff's hair, Ricci again admitted making it but claimed she meant it as a compliment; Ricci said she was also a hairdresser and was curious to learn how Plaintiff styled her hair because it was so straight. Gulino advised Ricci that despite her intentions, Plaintiff perceived the comments to be offensive and that Ricci needed to be more cognizant of how she spoke to other employees in the workplace. Although Ricci denied any racial motive for her comments, Gulino determined that the comments made Plaintiff uncomfortable and therefore were inappropriate for the workplace. (Pl.'s 56.1 ¶¶ 31-36.)

On December 19, 2014, Gulino and Evangelista met with Ricci and, due to her comments to Plaintiff, provided her with a written warning for violations of Hospital policy and the Hospital's standards of performance. Ricci was also advised that any similar conduct or comments in the future would result in further disciplinary action, up to and including termination of her employment. Gulino and Evangelista requested that Ricci apologize to Plaintiff. Although Ricci did apologize, Plaintiff contends it was a feigned apology and that Ricci complained to Plaintiff that her complaint may have cost her a full-time position with the Hospital. (Pl.'s 56.1 ¶¶ 37-40.)

Gulino met with Plaintiff[1] and informed her of his conversation with Ricci and explained that the Hospital does not tolerate discrimination of any kind and is proud of the diversity of its employees. He informed Plaintiff that if she should ever feel uncomfortable in the future she should bring it to his attention immediately. (Pl.'s 56.1 ¶¶ 41-43.)

## IV. Plaintiff's Job Performance

The Hospital Laboratory's Mislabeled and Unlabeled Specimen Policy (the "Labeling Policy") requires that all blood cultures be labeled at the patient's bedside so that the Hospital may properly identify a patient's blood specimen. Employees who engage in policy infractions are subject to the Hospital's progressive discipline, up to and including termination of employment. On the first occurrence of a mislabeled or unlabeled specimen, the individual who made the error would be assessed 12 points for the occurrence and receive a written warning. Any additional mislabeled or unlabeled specimen occurrences would add additional points to an individual's point accrual. If an individual's points exceed 25 points, the individual's

---

[1] There is a dispute as to whether this meeting occurred before or after Ricci apologized, but this dispute is immaterial.

employment is terminated. The exact language of the policy is that "[s]hould an individual at any point exceed 25 points they will be discharged." (Pl.'s 56.1 ¶ 48; Ex. D to Gulino Aff.)

On February 5, 2015, Plaintiff failed to label blood cultures taken from the Hospital's emergency room at a patient's bedside, as required by Hospital policy. She received a written warning for her failure to label the blood cultures and was assessed 12 points. Evangelista met with Plaintiff and counseled her regarding her failure to follow Hospital policy and warned Plaintiff that repeat offenses would lead to additional disciplinary action, up to and including suspension and/or termination of employment. Although admitting she failed to label the blood cultures as required by Hospital policy, Plaintiff claims that another employee mistakenly took the yet-to-be labeled culture. She also claims that she was later told the points assessment was being changed so she could apply for a transfer to a different position in the hospital as one cannot transfer unless you have no points.[2] (Pl.'s 56.1 ¶¶ 47-52.)

On or about February 25, 2015, Plaintiff advised Gulino that she was concerned that Ricci was exhibiting a lack of concern for the comfort and well-being of her patients. She stated that she heard complaints about Ricci from patients and from another phlebotomist, Jen Ehrman. Gulino directed Evangelista to perform patient audits on Ricci's patients and to interview Ms. Ehrman. Evangelista interviewed five patients, who each communicated that he or she was satisfied with Ricci's care and stated Ricci was pleasant, helpful and did a good job drawing their blood. She also interviewed Ms. Ehrman, who stated that she did not make comments to Plaintiff about Ricci. (Pl.'s 56.1 ¶¶ 53-58.)

---

[2] In her 56.1 Statement Plaintiff asserts that the points were taken away as a result of the other employee having mistakenly taken the cultures. However, the deposition testimony that she cites does not support that assertion. Rather, according to her deposition, the points were going to be taken away so she could attempt to transfer to another department in the Hospital. (Ex. A to Kaske Dep. (McCullough Dep.) at 118-119.) It is also noteworthy that in a note written by Plaintiff to Marotta, Plaintiff recounts that Gulino said he could not take away the points. (Ex. H to Gulino Aff.)

On March 4, 2015, Plaintiff received her Performance Evaluation for her probationary period. She did not pass her probationary period. According to that evaluation, Plaintiff's job performance in the following four categories needed improvement: (1) "[m]aintains an acceptable attendance record;" (2) "[t]reats coworkers, patients and physicians with respect, courtesy and professionalism;" (3) "labels the test tube immediately after procedure is completed with patient name, room, date, time and initials;" and (4) "[u]ses time between tests to departmental advantage by filling in with office work, assisting technical staff, performing general household duties, putting away supplies, or performing other duties as necessary." She was rated as "meets standard" in the other 45 categories on the evaluation. The Performance Evaluation also provided a development plan for "all competencies/accountabilities where standards [were] not met." The development plan noted Plaintiff's February 5 incident regarding unlabeled specimens causing her to receive twelve points and stated that Plaintiff needed to work on her attendance and commitment to the Hospital's Phlebotomy Department and her ability to communicate with her coworkers and treat them with respect, courtesy, and professionalism, as well as that she needed help in performing general household duties, putting away supplies and restocking the lab. According to the evaluation, the Hospital extended Plaintiff's probationary period for an additional three months "due to the unlabeled specimen and the accumulation of 12 points."

Gulino and Evangelista advised Plaintiff she should continue with in-service training and review the Hospital's policies and procedures to assist her in improving in the performance of her job responsibilities. (Pl.'s 56.1 ¶¶ 59-68.) Plaintiff disputes the accuracy of the "needs improvement" rating in her evaluation. She contends that she "treated her co-workers with respect, courtesy, and professionalism, and had a good working relationship with most of her co-

corkers." Plaintiff also claims she was subject to over-the top scrutiny and insulting behavior. For example "Evangelista was demeaning to her," "told Plaintiff that if she did not like the schedule she should resign," and "repeatedly spoke down to her and embarrassed her in front of other employees." (Pl.'s 56.1 ¶¶ 45-46.)

On March 12, 2015, the Hospital received a written complaint from Wendy Taranto, a technician in the Laboratory Accessioning Department, regarding Plaintiff's conduct. According to Ms. Taranto, on March 2, 2015, while working with her in the Phlebotomy Department, Plaintiff began questioning her about another phlebotomist and that phlebotomist's job performance; when Ms. Taranto informed Plaintiff that she did not think it was appropriate to discuss job performance of other coworkers, Plaintiff became agitated and acted rudely toward her.  Ms. Taranto reported to the Hospital that Plaintiff's conduct made her feel extremely uncomfortable. Plaintiff disputes having any such conversation with Ms. Taranto. (Pl.'s 56.1 ¶¶ 70-74.)

Also on March 12, 2015, Plaintiff, accompanied by her husband, met with Gulino to discuss her schedule. She complained that Evangelista had not scheduled her to work for three weeks. Gulino reminded Plaintiff that she had advised him that she had received a summons for jury duty for two weeks and that she was taking a vacation for an additional week. Schedules in the Phlebotomy Department are posted four weeks in advance and Evangelista created those schedules anywhere from eight to twelve weeks in advance. Gulino advised Plaintiff that as a per diem employee, she did not have a set schedule. Evangelista indicated to Gulino that she was waiting for communication from Plaintiff regarding her availability to work. Plaintiff states that she advised Evangelista "that she was not required to serve on jury duty for the remaining two weeks" and Evangelista told her not to call her about the schedule, but rather wait for

Evangelista's call. Gulino spoke to Evangelista to see if there were any available shifts during the week Plaintiff had indicated that she would be on vacation. On March 13, 2015, Gulino met with Evangelista to advise her of his meeting with Plaintiff and to attempt to resolve any remaining scheduling issues. (Pl.'s 56.1 ¶¶ 75-86.)

On May 15, 2015, Evangelista received an email complaint from a medical assistant, Ria Ramdeen, regarding Plaintiff's poor performance. Ms. Ramdeen informed her that on May 14, 2015, she requested that the lab draw blood from an 80-year-old patient with arteriovenous fistulas in both veins, which meant that the patient had very fragile veins. According to Ms. Ramdeen, both she and another coworker, Mary Greco, were concerned over the manner in which Plaintiff attempted to draw blood from the patient, as well as Plaintiff's apparent lack of concern for the patient's well-being. While acknowledging the complaint was received, Plaintiff denies that she assisted the patient in an improper manner. (Pl.'s 56.1 ¶¶ 87-89.)

On May 29, 2015, Plaintiff received another written warning for violation of Hospital policy and poor work performance. Specifically, Plaintiff performed a phlebotomy and left blood specimens on a patient's tray unlabeled, in violation of Hospital policy. The patient discovered the blood specimens and immediately contacted his nurse, who in turn called the laboratory and advised Evangelista of the incident. Evangelista verbally counseled Plaintiff and reminded her that Hospital policy was to label all specimens bedside with the patient present; she also advised Plaintiff that having been previously counseled regarding the same conduct, any further offenses would lead to additional disciplinary action up to and including termination. Plaintiff was assessed twelve points for this violation. Thus, within a three-and-a-half-month period, Plaintiff was assessed a total of 24 points, one point less than that which required termination of employment. (Pl.'s 56.1 ¶¶ 90-97.)

## V.     Plaintiff Complains of Retaliation

On April 3, 2015, Plaintiff met with Marotta, the Vice President of Human Resources. She advised Marotta that she felt Evangelista was retaliating against her based upon her prior complaint of discrimination by (1) assigning her fewer hours than she had previously been assigned; (2) not permitting her to train a new employee; and (3) counseling her and giving her warnings that she did not believe were warranted. Marotta met with Plaintiff regarding her complaints on April 2, April 8, April 24 and May 6, 2015. During these meeting Plaintiff reiterated her complaints about Evangelista and advised Marotta she was not happy working in phlebotomy and wanted to transfer out of the laboratory. Marotta met with both Gulino and Evangelista to discuss Plaintiff's allegations of retaliation. Evangelista assured Marotta that she was not retaliating against Plaintiff in any way. She advised that a full-time employee without disciplinary action had been selected to train new employees and that since Plaintiff was a per diem employee, she was scheduled to work at times when the Phlebotomy Department needed assistance; as Plaintiff was unavailable evenings and weekends her scheduling limitations did not always coincide with the operational needs of the department. Both Gulino and Evangelista explained to Marotta that Plaintiff had serious difficulty accepting constructive criticism from her supervisors and did not interact well with her coworkers. At the conclusion of her investigation, Marotta determined that Evangelista had not retaliated against Plaintiff. (Pl.'s 56.1 ¶¶ 98-110.)

On or about June 5, 2015, Marotta met with Plaintiff and Shattes, Vice President of Administration at the Hospital, regarding the results of the Hospital's investigation into Plaintiff's complaint of retaliation. Plaintiff advised Marotta and Shattes that she no longer wanted to work in the Phlebotomy Department and expressed an interest in a clerical position

within the Hospital. The Hospital attempted to accommodate Plaintiff's request for a transfer; it arranged for Plaintiff to take the tests required to transfer to a clerical position within the Hospital. Plaintiff took two typing tests and a math test, tests which are required of all individuals who apply for clerical employment with the Hospital. She did not pass any of the examinations required for the clerical positions and thus she was not eligible to apply for any such positions. As a result of plaintiff's failure to qualify for a clerical position with the Hospital, Marotta advised Plaintiff that she would assist her in obtaining alternate employment. (Pl.'s 56.1 ¶¶ 111-119.)

## VI. Plaintiff's Employment at Harborview

Marotta did in fact assist Plaintiff in obtaining alternate employment, viz. a clerical position at Harborview Medical Services ("Harborview"), a physician practice group. Plaintiff was offered and accepted a position working directly with the Administrator in charge of Harborview, Terry Bertovich ("Bertovich"). Plaintiff's employment with Harborview was terminated; the reason given was the use of inappropriate language in front of patients. While she admits she was told she was terminated for saying "fuck" in the workplace, she disputes that she was terminated for this reason as Bertovich and other employees of Harborview use the same language in the workplace. (Pl.'s 56.1 ¶¶ 120-123.)

## VII. Matters Omitted from Plaintiff's Resume

Prior to her employment at the Hospital, Plaintiff worked for Rheumatology Associates from approximately the summer of 2013 to December 3, 2013. Although she had been employed with Rheumatology Associates for approximately three months, said employment was omitted from the resume Plaintiff submitted in support of her application for a position with the Hospital and she did not disclose the termination of her employment from that position. The reason given

for her termination from Rheumatology Associates was that she physically blocked a doctor from passing through a door in the office; Plaintiff asserts she was terminated because of her race.  (Pl.'s 56.1 ¶¶ 124-128.)

## DISCUSSION

### I.      Summary Judgment Standard

Summary judgment, pursuant to Rule 56, is appropriate only where the movant "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  The relevant governing law in each case determines which facts are material; "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  When making this determination, a court must view all facts "in the light most favorable" to the non-movant, *Tolan v. Cotton*, 134 S. Ct. 1861, 1866 (2014), and "resolve all ambiguities and draw all permissible factual inferences in favor of the [non-movant]," *Johnson v. Killian*, 680 F.3d 234, 236 (2d Cir. 2012) (quoting *Terry v. Ashcroft*, 336 F.3d 128, 137 (2d Cir. 2003)).  Thus, "[s]ummary judgment is appropriate [only] where the record taken as a whole could not lead a rational trier of fact to find for the [non-movant]." *Id.* (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)) (internal quotation marks omitted).

To defeat a summary judgment motion properly supported by affidavits, depositions, or other documentation, the non-movant must offer similar materials setting forth specific facts demonstrating that there is a genuine dispute of material fact to be tried. *Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009).  The non-movant must present more than a "scintilla of evidence," *Fabrikant v. French*, 691 F.3d 193, 205 (2d Cir. 2012) (quoting *Anderson*, 477 U.S. at 252), or

"some metaphysical doubt as to the material facts," *Brown v. Eli Lilly & Co.*, 654 F.3d 347, 358 (2d Cir. 2011) (quoting *Matsushita*, 475 U.S. at 586-87), and "may not rely on conclusory allegations or unsubstantiated speculation," *Id*. (quoting *FDIC v. Great Am. Ins. Co.*, 607 F.3d 288, 292 (2d Cir. 2010).

The district court considering a summary judgment motion must also be "mindful . . . of the underlying standards and burdens of proof," *Pickett v. RTS Helicopter*, 128 F.3d 925, 928 (5th Cir. 1997) (citing *Anderson*, 477 U.S. at 252), because the "evidentiary burdens that the respective parties will bear at trial guide district courts in their determination[s] of summary judgment motions," *Brady v. Town of Colchester*, 863 F.2d 205, 211 (2d Cir. 1988). "[W]here the [non-movant] will bear the burden of proof on an issue at trial, the moving party may satisfy its burden by pointing to an absence of evidence to support an essential element of the [non-movant's] case." *Crawford v. Franklin Credit Mgmt. Corp.*, 758 F.3d 473, 486 (2d Cir. 2014) (quoting *Brady*, 863 F.2d at 210-11) (internal quotation marks omitted). Where a movant without the underlying burden of proof offers evidence that the non-movant has failed to establish his claim, the burden shifts to the non-movant to offer "persuasive evidence that his claim is not 'implausible.' " *Brady*, 863 F.2d at 211 (citing *Matsushita*, 475 U.S. at 587). "[A] complete failure of proof concerning an essential element of the [non-movant's] case necessarily renders all other facts immaterial." *Crawford*, 758 F.3d at 486 (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

## II.     Hostile Work Environment Claim

### A.     Applicable Law

Title VII and NYSHRL prohibits an employer from discriminating against an employee on the basis of race, color, religion, sex, or national origin. *See* 42 U.S.C. § 2000e-2(a)(1); N.Y.

Exec. Law ¶ 296. These prohibitions encompass "requiring people to work in a discriminatory hostile or abusive environment." *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21 (1993).

Where a claim of hostile work environment is asserted, the plaintiff must demonstrate, he or she is a member of a protected class and "that [his or] her workplace was permeated with discriminatory intimidation that was sufficiently severe or pervasive to alter the conditions of [his or] her work environment . . . ." *Schwapp v. Town of Avon*, 118 F.3d 106, 110 (2d Cir. 1997) (quotation marks omitted). This standard is a "demanding one," *Scott v. Mem'l Sloan-Kettering Cancer Ctr.*, 190 F. Supp.2d 590, 599 (S.D.N.Y. 2002), requiring that a plaintiff establish both objective and subjective components, to wit, "not only that [the plaintiff] subjectively perceived the environment to be abusive, but also that the environment was objectively hostile and abusive." *Gorzynski v. JetBlue Airways Corp.*, 596 F.3d 93, 102 (2d Cir. 2010); *see also Demoret v. Zegarelli*, 451 F.3d 140, 149 (2d Cir. 2006) ("Plaintiff must show not only that [he] subjectively perceived the environment to be abusive, but also that the environment was objectively hostile and abusive."). Furthermore, "there must be a specific basis for imputing the conduct creating the hostile work environment to the employer." *Doner–Hendrick v. N.Y. Inst. of Tech.*, 2011 WL 2652460, at *5 (S.D.N.Y. July 6, 2011) (internal quotation marks omitted).

"Isolated incidents typically do not rise to the level of a hostile work environment unless they are 'of sufficient severity' to 'alter the terms and conditions of employment as to create such an environment.' " *Demoret*, 451 F.3d at 149 (quoting *Patterson v. Cnty. of Oneida,* 375 F.3d 206, 227 (2d Cir.2004)). Rather, "[c]ourts look at all circumstances to ascertain whether an environment is sufficiently hostile or abusive to support a claim." *Leibovitz v. N.Y. City Transit Auth.*, 252 F.3d 179, 188 (2d Cir. 2001). "Among the factors to be considered in determining

whether conduct is sufficiently hostile under the totality of the circumstances are: frequency; severity; whether the conduct is physically threatening or humiliating; and whether it interferes with an employee's performance." *Scott*, 190 F. Supp.2d at 599 (citing *Harris*, 510 U.S. at 23). "[T]he Second Circuit has made it clear that insensitive comments are not per se unlawful." *Id*. (citing *Williams v. County of Westchester,* 171 F.3d 98, 101 (2d Cir. 1999)); *see Preuss v. Kolmar Lab., Inc.*, 970 F. Supp. 2d 171, 184 (S.D.N.Y. 2013) (The "mere utterance of an epithet which engenders offensive feelings in an employee does not sufficiently affect the conditions of employment to establish a hostile work environment claim.") (internal quotation marks omitted). It is necessary for the plaintiff to establish a link between the actions by defendants and plaintiff's membership in a protected class. *Alfano v. Costello,* 294 F.3d 365, 374 (2d Cir. 2002); *Brown v. Henderson*, 257 F.3d 246, 252 (2d Cir. 2001).

### B.    The Parties' Positions

Defendant argues that it is entitle to summary judgment on Plaintiff's hostile work environment claim as it is premised on the comments by Ricci, which are insufficient to support such a claim and because there is no basis to impute Ricci's comments to the Hospital. Plaintiff's memorandum does not address her hostile work environment claim.

### C.    Defendant's Motion is Granted as to the Hostile Work Environment Claim

By failing to address her work hostile work environment claim, Plaintiff has abandoned it.[3] On that basis alone, the Hospital is entitled to summary judgment in its favor on that claim. *See, e.g., Felix v. N.Y.S. Dept. of* Corrections, 2018 WL 352859 (S.D.N.Y. July 23, 2018).

---

[3] The Court notes that Defendant makes three arguments in support of its motion for summary judgment (1) Plaintiff has not a stated a claim for discrimination; (2) Plaintiff was not subject to a hostile work environment; and (3) Plaintiff has not established a retaliation claim. (*See* Def.'s Mem. (DE 38) at 9, 19, 22.) The complaint however, only asserts claims for hostile work environment (under both Title VII and the NYHRRL) and retaliation under the two foregoing statutes. Accordingly, the Court need not address any claim for "discrimination" other than hostile work environment and retaliation.

Moreover, the evidence proffered in this case is insufficient to support a hostile work environment claim. Ricci's comments, while wholly inappropriate, are not sufficiently severe to permit a rational fact-finder to conclude that the conditions of Plaintiff's working environment were altered by a workplace severely "permeated with discriminatory intimidation, ridicule and insult." *LaBella v. New York City Admin. for Children's Servs*., 2005 WL 2077192, at *19 (E.D.N.Y. Mar. 28, 2005). Nor is there any basis to impute Ricci's comments to the Hospital. Indeed, upon learning of Ricci's comments, the Hospital undertook an immediate investigation and undertook steps to remedy the conduct of Ms. Ricci, including disciplining her.

Similarly, the criticism of Plaintiff's work performance does not support a hostile work environment claim. There is nothing to suggest that they are tied to Plaintiff's protected status.[4] *See Gregory v. Daly*, 243 F.3d 687, 694 (2d Cir. 2001) (there must be "factual circumstances that permit the inference that plaintiff was subjected to a hostile work environment because of his [protected status]"); *Murphy v. BeavEx Inc.,* 544 F. Supp. 2d 139 151 (D. Conn. 2008) (finding comments directed at plaintiff-employee's job performance did not display "discriminatory animus" and did not support hostile work environment claim).

Defendant's motion for summary judgment on the hostile work environment claim is granted.

## III.    The Retaliation Claim

### A.    Applicable Law

Title VII and the NYSHRL prohibit retaliation against employees who engage in protected activity. *See, e.g., Treglia v. Town of Manlius*, 313 F.3d 713, 719 (2d Cir. 2002);

---

[4]  The Court notes that the submission on this motion does not contain any allegation as the nature of Plaintiff's protected status. The complaint does identify her as "black," but the complaint is not evidence. Based on the nature of the comments by Ricci about which Plaintiff complained to the Hospital, the Court has deduced that the category at issue is race.

*Vasquez v. Empress Ambulance Serv., Inc.,* – F.3d –, 2016 WL 4501673 (2d Cir. Aug. 29, 2016). Such retaliation claims are analyzed using the McDonnell Douglas "burden-shifting" formula. *See, e.g., Kessler v. Westchester Cnty. Dep't of Social Servs.*, 461 F.3d 199, 205 (2d Cir. 2006).

To make out a prima facie case of retaliation, a plaintiff must show that "she engaged in protected participation or opposition under Title VII, that the employer was aware of this activity, that the employer took adverse action against the plaintiff, and that a causal connection exists between the protected activity and the adverse action, i.e., that a retaliatory motive played a part in the adverse employment action." *Sosa v. Rockland County Community College*, 2017 WL 3105872 (S.D.N.Y. July 20, 2017) (internal quotation marks omitted); *see Miller v. Praxair*, 408 Fed. App'x 408, 409-10 (2d Cir. 2010).[5]

The first element of a prima facie case is that the plaintiff engaged in protected activity and that the employer was aware of this activity. Protected activity for purposes of Title VII include "informal protests of discriminatory employment practices, including making complaints to management." *DeVore v. Neighborhood Housing Servs. of Jamaica, Inc.,* 2017 WL 1034787, *9 (E.D.N.Y. Mar. 16, 2017) (citing *Littlejohn v. City of New York*, 795 F.3d 297, 317-18 (2d Cir. 2015)). Generalized complaints, however, are insufficient; complaints must be sufficiently specific to make clear that the employee is complaining about conduct prohibited by the applicable discrimination statute. *See Rojas v. Roman Catholic Diocese of Rochester*, 660 F.3d 98, 108 (2d Cir. 2011). "To the extent that an employee complains about perceived 'unfair' treatment relating to job responsibility, hiring practices, or corporate policy, but fails to link the treatment to unlawful discrimination or to his protected status, he fails to establish that he was engaged in protected activity." *Penberg v. HealthBridge Mgmt.*, 823 F. Supp. 2d 166, 191

---

[5]  The same analysis applies to retaliation claims under the NYSHRL.

(E.D.N.Y. 2011) (citing, inter alia, *Velasquez v. Goldwater Memorial Hosp.*, 88 F. Supp. 2d 257, 264 (S.D.N.Y. 2000) (general complaints about corporate policy without linking it to plaintiff's status are insufficient to establish "protected activity" under Title VII).

The second element is that the employer took adverse action against the plaintiff. In the context of "Title VII's antiretaliation provision, unlike the substantive provision," retaliation "is not limited to discriminatory actions that affect the terms and conditions of employment." *Davis-Garett v. Urban Outfitters, Inc.*, -- F.3d --, 2019 WL 1510428, *10 (2d Cir. Apr. 8, 2019) (internal quotation marks omitted). "Instead, the proper question for a retaliation claim is whether the alleged adverse action to which the plaintiff was subjected could well have dissuaded a reasonable employee in his position from complaining of unlawful discrimination." *Id.* (internal quotation marks and brackets omitted).

The last and final element is that a causal connection exists between the protected activity and the adverse action, i.e. that a retaliatory motive played a part in the adverse employment action. *Kessler v. Westchester Cnty. Dep't of Social Servs.*, 461 F.3d 199-205-06 (2d Cir. 2006) (citation omitted). "Causation can be proven (1) directly 'through evidence of retaliatory animus directed against the plaintiff by the defendant;' or (2) indirectly either (a) 'by showing that the protected activity was followed closely by discriminatory treatment,' or (b) through other circumstantial evidence such as disparate treatment of fellow employees who engaged in similar conduct.'" *D'Andrea v. Nielsen*, -- F. App'x --, 2019 WL 1503923, * 2 (2d Cir. April 5, 2019) (quoting *Gordon v. N.Y.C. Bd. of Educ.,* 232 F.3d 111, 117 (2d Cir. 2000). The Second Circuit "has not drawn a bright line to define the outer limits beyond which a temporal relationship is too attenuated to establish a causal relationship," *Gorman–Bakos v. Cornell Co-op Extension of Schenectady Cnty.*, 252 F.3d 545, 554 (2d Cir. 2001). It has, however, upheld an inference of a

causal connection based on lapses of up to eight months between the protected activity and the alleged retaliatory actions. *Grant v. Bethlehem Steel Corp.*, 622 F.2d 43, 45–46 (2d Cir. 1980) (eight month gap between EEOC complaint and retaliatory act suggested causal relationship); *see Espinal v. Goord*, 558 F.3d 119, 129 (2d Cir. 2009) (inferring causal connection with six-month lapse); *Gorman–Bakos*, 252 F.3d at 554 (same with five month lapse); *see also Cioffi v. Averill Park Central School Dist. Bd of Ed.*, 444 F.3d 158, 168 (2d Cir. 2006) (little over three months in not "too long for any inference of retaliatory motive and causation to be drawn").

"[I]f the plaintiff establishes a prima facie case, 'the burden shifts to the employer to articulate some legitimate, non-retaliatory reason for the employment action.'" *D'Andrea,* --F. App'x --, 2019 WL 1503923, * 2 (quoting *Zann Kwan v. Andalex Grp. LLC,* 737 F.3d 834, 846 (2d Cir. 2013)).

Lastly, if a legitimate non-retaliatory reason for the adverse action is proffered, "the burden shifts back to the plaintiff to show that the defendant's reason is 'a mere pretext for retaliation.' The plaintiff also 'must show that retaliation was a 'but-for' cause of the adverse action, and not simply a 'substantial' or 'motivating factor in the employer's decision." *Id.* (quoting *Zann Kwan*, 737 F.3d at 845). While the but-for reason need not be the only reason, a plaintiff must show that "the adverse action would not have occurred in the absence of the retaliatory motive." *Id.* (internal quotation marks omitted).

### B.    The Parties' Positions

Based on the parties' submission there is no dispute that Plaintiff engaged in protected activity and that the Hospital was aware of this activity. Defendant maintains that there is no causal connection between any protected activity and any adverse employment action. In

addition, the Hospital has articulated legitimate, non-discriminatory reason for each employment action and Plaintiff cannot demonstrate that such reasons are pretextual.

In response, Plaintiff asserts the following acts of retaliation: a poor review and write up caused her probation period to be extended, her hours were reduced, and the hospital stripped McCullough of her primary duties and decided not to continue her employment. (Pl.'s Mem. in Opp. at 16.) Further, the causation element has been met as these acts closely followed her complaint regarding Ricci. Finally, Plaintiff argues that there are questions of facts as whether retaliation was the but-for cause of the adverse action as there is evidence that the reasons are pretextual.

### C.    Application

#### 1.    Plaintiff has Established a Prima Facie Case

As noted earlier, there is no dispute regarding the first element of a retaliation claim.

Turning then to the second element, whereas Plaintiff asserts she was subject to an adverse action, Defendant argue there was no adverse action taken against Plaintiff. However, in making these assertions, both parties rely upon case law regarding the adverse action requirement for a discrimination claim which requires that an adverse action be an action that affects the terms and conditions of employment. As the Second Circuit recently reiterated in *Davis-Garett*, "the harm element of a retaliation claim is not to be analyzed in the same way as the harm from an alleged substantive act of discrimination." 2019 WL 1510428, at *10. "Instead the proper question for a retaliation claim is whether the alleged adverse action to which the plaintiff was subjected could well have dissuaded a reasonable employee in his position from complaining of unlawful discrimination." *Id.* (internal quotation marks omitted).  Thus "[t]he scope of actions that may be materially adverse is . . . broader for purposes of retaliation claims

than for discrimination claims." *Pape v. Dircksen & Talleyrand, Inc.*, 2019 WL 1441125, * 8 (E.D.N.Y. Mar. 31, 2019). Given the nature of the adverse actions alleged by Plaintiff viz. the extension of her probationary period, this standard has been met. Unlike in a discrimination context, "a negative performance review can constitute an adverse action for purposes of a retaliation claim," *Cerni v. J.P. Morgan Secs. LLC*, 208 F. Supp. 3d 533, 539 (S.D.N.Y. 2016) (citing *Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 91 (2d Cir. 2015), as can a change in duties, *Annunziata v. Int'l Bhd. of Elec. Workers Local Union # 363*, 2018 WL 2416568, *18-19 (S.D.N.Y. May 29, 2018).

Finally, given the close temporal connection between Plaintiff's December complaint about Ricci and the above adverse actions there is evidence of a causal connection. *Grant v. Bethlehem Steel Corp.*, 622 F.2d 43, 45-46 (2d Cir. 1980) (eight month gap between EEOC complaint and retaliatory act suggested causal relationship); *see Espinal v. Goord*, 558 F.3d 119, 129 (2d Cir. 2009) (inferring causal connection with six-month lapse); *Gorman–Bakos*, 252 F.3d at 554 (same with five month lapse); *see also Cioffi v. Averill Park Central School Dist. Bd of Ed.*, 444 F.3d 158, 168 (2d Cir. 2006) (little over three months in not "too long for any inference of retaliatory motive and causation to be drawn").

2.     Defendant has Articulated Legitimate Non-retaliatory
Reasons for the Adverse Actions Alleged

The Hospital has articulated legitimate non-retaliatory reasons for each of the alleged retaliatory acts.

Turning first to the extension of her probationary period, the Hospital has a "Mislabeled and Unlabeled Specimens Policy," which, it is undisputed, is uniformly enforced, was violated by Plaintiff, and which provided for the assessment of 12 points. According to Defendant, given

that Plaintiff's first violation occurred during her initial three month probationary period, her probationary period was extended.

Second, as articulated by the Hospital, the reduction of her hours was the result of her advising that she had received a jury summons notice and that she was going to then take a week off for vacation.

Finally, with regard to her termination, it was based on her having violated the Specimen Policy twice while on probation.

### 3. Plaintiff Has Failed to Submit Evidence of Pretext

While Plaintiff disputes the validity of the Hospital's reasons set forth above, the evidence submitted is insufficient to permit a reasonable trier of fact to conclude that the proffered reasons were pretextual and that the adverse action would not have occurred in the absence of the retaliatory motive.

First, the Hospital has submitted unrefuted evidence that it is not unusual to extend the probationary period for Phlebotomy laboratory assistants and, in fact, other probationary employees who made such errors were not given an extension, but rather terminated. Gulino Aff. ¶ 28 & Ex. K. Here, having committed a violation of the Labeling Policy during her initial probationary period, Plaintiff was not terminated but rather received an extension of her probation. During her deposition she admitted that she received an extension "to give [her] an opportunity to demonstrate that [she] could perform [her] job . . . ." (Ex. A to Kaske Decl. (McCullough Dep.) at 148:11-18.) Additionally, even if Plaintiff's explanation for the first violation of the labeling policy is credited, it remains undisputed that there was another incident, on May 29, 2015, during the extension of her probationary period. And while Plaintiff disputes having the reported conversation with Ms. Taranto, she does not dispute that Taranto reported

that Plaintiff's conduct made her uncomfortable. Nor does she dispute that the investigation into Plaintiff's complaint about Ricci harming patients failed to substantiate that allegation.

With respect to the alleged reduction of her hours, Plaintiff does not dispute that she advised the Hospital she received a jury summons and that she was taking a vacation. Nor does she dispute that the schedules for the Phlebotomy Department are created eight to twelve weeks in advance and posted four weeks in advance. In her own words, she advised Evangelista "that she was not required to serve on jury duty for the *remaining* two weeks" (Pl.'s 56.1 at ¶ 80[6] (emphasis added).) In other words, according to Plaintiff, it was after her commencement of jury duty, and thus after the schedule had been created and posted, that she informed Evangelista that she would not have to serve. Against that backdrop and considering Plaintiff's position was per diem, neither Plaintiff's omission from the schedule or Evangelista telling her not to call her about the schedule but rather wait for Evangelista's call would permit a reasonable trier of fact to infer retaliation. With respect to her vacation, Plaintiff points to nothing to indicate that she advised Evangelista regarding her change in plans, no less that she advised her of such prior to the relevant schedule being drawn. And, it is undisputed that when Plaintiff complained to Gulino that she was not scheduled, he spoke to Evangelista to see if there were any available shifts during the week Plaintiff had indicated she would be on vacation. Finally, regarding Plaintiff's complaint concerning Ricci, as well as her complaints of retaliation, Plaintiff points to nothing to support that the Hospital's investigation was lacking. As a result of the investigation into Ricci's comments, Ricci was disciplined. And while the investigation into Plaintiff's complaints of retaliation did not support that claim, Plaintiff nonetheless was able to take the

---

[6] Although labeled at "Response to 76," the statement referenced in text follows and is responsive to ¶ 80 of Defendant's 56.1 Statement.

tests in her attempt to transfer to another department and, when she did not pass any of those

tests, was given assistance in finding another position outside the Hospital.

## CONCLUSION

For the reasons set forth above, Defendant's motion for summary judgment is granted.

The Clerk of Court is directed to enter judgment accordingly and to close this case.

**SO ORDERED.**

Dated: Central Islip, New York       _s/ Denis R. Hurley
       April 19, 2019             Denis R. Hurley
                                      United States District Judge